UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

STEPHEN WAYNE WHITING,

    Plaintiff,

    v.                             CAUSE NO. 3:18-CV-331-PPS-MGG

KRIBBS, *et al.*,

    Defendants.

OPINION AND ORDER

A week after being transported to the LaPorte County Jail, pro se Plaintiff Stephen Whiting noticed a spot on his arm which resembled a pimple and was warm and sensitive. Whiting claims he spent the next four days trying to get the attention of two nurses at the jail, Defendants Keith Buckland and Gina Salinas,[1] so that he could get the proper medical treatment for his arm. On the fifth day, Salinas took a picture of the spot and sent it to the jail doctor who prescribed an antibiotic and Tylenol. Six days later, the jail doctor examined Whiting in person and by that time the spot was almost completely healed. The doctor characterized the spot as a localized MRSA "furuncle," a painful, pus-filled bump under the skin (a boil) caused by an infected, inflamed hair follicle. Less than two weeks later, Whiting's arm was completely healed. Whiting

---

[1] Although their names are spelled "Gina Salenez" and "Keith Bucklin" in the complaint, the correct spelling is Keith Buckland and Gina Salinas. Officer Cribbs' last name was also misspelled in the complaint (as "Kribbs"). For the sake of accuracy, I will use the correct spelling of names in this order.

submits that as a result of delayed treatment, he has a small scar in the area of the tattoo dedicated to his wife.

In addition to the two nurses, Whiting is suing two LaPorte County Sheriff Jail deputies, Ebony Cribbs and Christopher Cummings. He claims that they too ignored his pleas for help to get the necessary medical treatment and are liable. Buckland and Salinas (the nurses) filed a motion for summary judgment (ECF 83) and Cribbs and Cummings (the jail deputies) also filed a motion for summary judgment (ECF 87). Because I find there is no genuine issue as to any material facts and all the defendants are entitled to summary judgment, I will grant both motions.

## Discussion

### I. Motion for Dispositive Deadline

Before I get into the motions for summary judgment, on May 14, 2019, Whiting filed a motion for dispositive deadline. (ECF 63.) The deadline for dispositive motions was originally May 17, 2019. (ECF 34.) But the Court then extended the deadline for dispositive motions to July 1, 2019. (ECF 54.) Upon a motion from Defendants, the Court again extended the deadline for dispositive motions to July 15, 2019. (ECF 76.) The motion for dispositive deadline (ECF 63) is therefore denied as moot, as that deadline was already set by the Court.

Additionally, I note that Whiting cites to Federal Rule of Civil Procedure 56 in arguing that both motions for summary judgment are untimely because they were not filed within 30 days of the close of discovery. This argument fails because the Court

extended the deadline for dispositive motions to July 15, 2019, and both motions were timely filed on that date. (ECF 83, 87.)

## II. Summary Judgment Motions

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying" the evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment, I must view all facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. I will not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Summary judgment is not a substitute for a trial on the merits or a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.

1994). Instead, my sole task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne*, 337 F.3d at 770. If a reasonable factfinder could find in favor of the nonmoving party, summary judgment may not be granted. *Id.*

Because the consequences of summary judgment are so severe, I "must always guard against premature truncation of legitimate lawsuits merely because of unskilled presentations." *Kincaid v. Vail*, 969 F.2d 594, 598-99 (7th Cir. 1992). Although pro se plaintiffs are generally entitled to lenient standards, they are still required to comply with local procedural rules governing motions for summary judgment. *See, e.g., Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006). As I noted earlier, both summary judgment motions were filed on July 15, 2019. Both sets of defendants filed a notice of summary judgment to the pro se Plaintiff in accordance with *Timms v. Frank*, 953 F.2d 281, 285 (7th Cir. 1992). (ECF 85, 89.)

Let's turn to the facts in this case. As required, I construe all facts and draw all inferences in the light most favorable to Whiting, who is opposing Defendants' motions for summary judgment.

On February 27, 2018, Whiting was transferred from Westville Correctional Center to the LaPorte County Jail to await trial in a criminal case against him. At the time, the jail was overcrowded, and Whiting was the third inmate placed in a two-person cell and had to sleep on the dirty floor.

A week into his stay at the jail, on March 4, Whiting noticed a spot or bump the size of a penny on his forearm. "It was real hard. It was hot. It hurt. It was real sensitive." (ECF 88-2, Whiting Dep. at 10.)

The next morning, on March 5, he used the jail's kiosk computer[2] to request a medical appointment but the kiosk didn't work. (*Id.* at 11–12.) Nevertheless, that afternoon he was able to speak with and show his arm to Nurse Salinas who was passing out medications to the inmates. (*Id.* at 13.) She told Whiting that he needed to submit a medical request and gave him a single-use pack of antibiotic ointment and a bandage. (*Id.* at 11.)

The following day, on March 6, at 6:45 a.m., as Nurse Buckland was passing out medications, Whiting spoke with him through the slot in the cell door, and Whiting told Nurse Buckland that he had a sore on his arm that hurt and was getting really hot to the touch. (*Id.* at 14–15.) Buckland told Whiting to submit a medical request through the kiosk. Whiting responded that the kiosk wasn't working and Buckland "said that [Whiting] had to figure that out before he could get [him] upstairs." (*Id.* at 15.) Before dinner, Salinas came again and gave Whiting a bandage. Whiting told her that the bump was growing and hurting, and that he needed to take an antibiotic. (*Id.* at 16.)

In the morning of the third day, March 7, Whiting spoke with Buckland who once again told Whiting to put in a medical request. (*Id.* at 17.) Whiting explained that

---

[2] When the nurses distribute medications at the jail or are tending to the patients, inmates frequently stop them to make medical complaints or ask questions. To allow them to complete their duties with minimal interruption, inmates are required to submit their requests through the kiosk to be reviewed by the nurses, who then respond to the inquiries and, if necessary, schedule a medical appointment.

5

the kiosk was still not working and Buckland said he would speak to his boss and would get back to him. Buckland gave Whiting Tylenol and he may have given him a bandage. (*Id.* at 17, 19-20.) Whiting had soap in his cell, so he repeatedly washed the sore.

Sometime after speaking with Buckland, Whiting hit the cell button to let the correctional officers know that he was in pain and needed healthcare. He was told––he does not know by whom––to put in a medical request through the kiosk. Whiting again saw Nurse Salinas in the evening. She gave him another bandage and more antibiotic ointment and repeated that he had to get medical approval to be seen upstairs. (*Id.* at 20.)

Either on the fourth or fifth day (March 7 or 8), LaPorte County Jail Captain John Wilcher and Lieutenant Al Ott came to speak with Whiting about the kiosk. Whiting explained that he could not make a medical request through the kiosk and meanwhile he had a bump growing on his arm that was turning green. The officers apologized to him and promised to update the kiosk so he could submit his medical request. (*Id.* at 9.)

On the fifth day (March 8), Whiting was able to submit his medical request through the kiosk. By this time, the sore was the size of a quarter or half dollar and had opened up. (*Id.* at 23-24.) The sore was hurting to the point that Whiting struggled to sleep, especially because he slept on the floor and did not want the sore the get worse by touching the dirty floor. The other inmates, fearing Whiting's infection, told him to stay in his cell and to not touch anything. (*Id.*) Whiting feared the other inmates were going to hurt him, so he complied.

That same day, early in the morning, Whiting was added to the sick call. Buckland saw Whiting during his rotation and told him he'd be seen that day. (*Id.* at 32.) Around lunch time, Whiting had not yet had his medical appointment, so he asked Deputy Cribbs over the intercom to be seen by the medical staff. Cribbs told him to submit the request through the kiosk, but Whiting chose not to do that. Between noon and 4 p.m., Whiting called Cribbs seven or ten times, repeating that he needed to be seen by the medical staff because he had an open wound. (*Id.* at 25-26, 31.) Cribbs told him if he kept pushing the intercom button, he would be placed in segregation. (*Id.* at 31.)

That evening, Salinas was doing the rounds with deputy Kaylee Nugent and Whiting showed her his arm. (*Id.* at 33.) Salinas told Nugent to take Whiting to the medical office where she took a picture of his sore and sent it to the jail doctor. (*Id.*) She then squeezed out the sore and cleaned it. (*Id.*) The jail doctor prescribed an antibiotic and Tylenol. (*Id.*)

The next day, which would be the sixth day (March 10), Buckland met with Whiting during his medical pass but didn't give him medications at that time. Having not received his medication, Whiting called Deputy Cummings on the intercom and asked him to get someone from healthcare to bring the medication, but Cummings ignored him. Instead, Whiting received his medication at 2 p.m. and was given an additional dose in the evening (the medication was prescribed to be administered twice daily). Also in the evening, Salinas gave him another gauze, a bandage, and alcohol pads. (*Id.* at 35.)

By the ninth day, March 13, the open sore on Whiting's arm had closed, and by the eleventh day, March 15, when Whiting saw the jail doctor, he had no complaints and the sore was almost completely resolved. (*Id.* at 36.) By March 22 or 23, Whiting's arm was completely healed (*Id.* at 41–42), although the sore left a small scar on the tattoo dedicated to Whiting's wife. Whiting considers the tattoo ruined and is now embarrassed by it. (*Id.* at 34, 42.)

Let's turn to the applicable law. Since Whiting was a pretrial detainee at the LaPorte County Jail, his medical care claims must be assessed under the Fourteenth Amendment.[3] *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 856 (7th Cir. 2017). As a starting point, Whiting was entitled to reasonable medical treatment for serious medical needs. *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989-90 (7th Cir. 1998). "[M]edical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015)).

The inquiry for assessing a due process challenge to a pretrial detainee's medical care entails two steps. *Id.* at 353. The first step, which focuses on the intentionality of the individual defendant's conduct, "asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the

---

[3] In the screening order, Whiting was allowed to proceed under the Eighth Amendment to the United States Constitution. (ECF 5.) The facts of the case having been flushed out, it appears that the Fourteenth Amendment, which is more lenient to Whiting, is the proper avenue for evaluating his claims. In the end, however, the difference is immaterial: since Whiting cannot prevail under the Fourteenth Amendment, he also could not prevail under the more stringent Eight Amendment standard either.

8

consequences of their handling of [the plaintiff's] case." *Id.*; *see also McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018). A showing of negligence or even gross negligence will not suffice. *Miranda*, 900 F.3d at 353. The second step asks "whether the challenged conduct was objectively reasonable." *Id.* at 354. This requires me to "focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann*, 909 F.3d at 886. The objective reasonableness standard requires more than medical malpractice and "the state-of-mind-requirement for constitutional cases remains higher." *Miranda*, 900 F.3d at 353.

In this case, no reasonable jury could conclude that Nurse Buckland or Salinas are liable to Whiting under the Fourteenth Amendment because their actions were objectively reasonable. Similarly, no reasonable fact finder could find that Jail Deputies Cribbs or Cummings are liable under the Fourteenth Amendment on the basis of the facts before me.

I will start my analysis with the nurses. As noted above, the first question before me is to determine whether Whiting was suffering a serious medical need, so as to be entitled to reasonable medical treatment. Within the context of being a pretrial detainee, a serious medical need is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting and

citing *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008)). The medical condition "need not be life-threatening to be serious." *Id*.

The mention of boils may conjure images of Pharaoh Ramses II and all of Egypt suffering from the plague as described in the Book of Exodus. But that's not what happened to Whiting. He had a single boil on his arm, also known as a MRSA furuncle.[4] (ECF 84-3, Dr. Mitcheff Aff. at 2.) It started out the size of a penny and, at its worst, it was the size of a quarter or a half dollar. According to the doctor who treated him, "[i]n the correctional setting, almost all furuncles are from MRSA (Methicillin-resistant staphylococcus aureus)" and "[m]any small furuncles are not even treated with antibiotics but with warm compresses." (*Id*.) "When the MRSA infection is localized like Whiting's was, it is typically treated empirically with Bactrim DS and or warm compresses." (*Id*.)

Whiting noticed a spot or a bump on March 4, and he tried to get a medical appointment through the kiosk computer the next day but it wasn't working. He then told Nurse Salinas about it in the evening, when she was distributing medications to the inmates. Over the next two days, the spot kept getting bigger and remained warm to the touch and was painful. Up to this point, no reasonable juror could find that Whiting

---

[4] "Furuncles, or boils, are skin abscesses that result from staphylococcal infection. They affect a hair follicle and surrounding tissue. . . . Furuncles develop rapidly as pink or red bumps. They are often painful. The surrounding skin is typically red, inflamed and tender. The lesions often appear on the neck, breast, face, buttocks, or thighs. They occur in places prone to hair, sweat, and friction, and they tend to start in a hair follicle. The bump fills with pus within a few days, and it grows. The bigger it gets, the more painful it becomes. Furuncles may go away without any intervention. Sometimes they burst and heal without a scar within 2 days to 3 weeks. They are common among teenagers and young adults, and they affect males more than females. Overcrowded and unhygienic living conditions increase the risk." https://www.medicalnewstoday.com/articles/185421#symptoms (last visited March 11, 2020).

was suffering a serious medical condition for it was not so obvious that even a lay person would perceive the need for a doctor's attention. Whiting insists that he should have immediately received an antibiotic treatment or at least be seen by medical staff, but this has no basis in common life experiences. In fact, Whiting's treating doctor submitted an affidavit attesting that MRSA furuncles often resolve themselves with just the treatment of warm compresses and washing. And while different, Whiting's boil through these first three days can be likened to a rash, which even if hot and itchy, without more, cannot be considered a serious medical need. *Cf. Holden v. Knight*, No. 3:15-CV-432 JD, 2016 WL 696088, at *3 (N.D. Ind. Feb. 22, 2016) (collecting cases).

However, on the fourth day, the boil opened up and was oozing green liquid and Whiting had trouble sleeping because he feared that the boil could get infected if it came into contact with the dirty cell floor. From this point on, there are sufficient uncontested facts showing that Whiting began suffering from a serious medical condition, and it would have been obvious to a lay person that he needed medical care.

But, even after Whiting has shown he was suffering from a serious medical condition, he must also show that the nurses acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of Whiting's boil; and that they were not conducting themselves in an objectively reasonable manner. *Miranda*, 900 F.3d at 352-53. I'll start with Nurse Buckland since he would encounter

Whiting during the morning rounds.[5] Whiting first spoke with Buckland on March 6, before the boil opened up. Buckland told him to make a medical request through the kiosk, which was a reasonable response given that Whiting had not yet suffered a serious medical need and kiosk requisitions were the usual course of scheduling medical staff appointments so as not to interrupt the nurses' work on the floor. Whiting then explained that the kiosk wasn't working, and Buckland told him he had to figure "that out before he could get [him] upstairs." (Whiting Dep. at 15.) This too was a reasonable response under the circumstances as there was no obvious urgency to medically treat Whiting.

The next morning (March 7), Whiting spoke with Buckland again, explaining that the kiosk still wasn't working and Buckland told Whiting that he would speak to his boss and get back to him. Buckland gave Whiting Tylenol and he may have given Whiting a bandage. That same day or the next day, jail supervisors came to speak with Whiting about the problems he was having with the kiosk and the next day, Whiting was able to make the medical requisition through the kiosk. Again, there's no recklessness in Buckland's actions here. There was no interaction between Whiting and Buckland on March 8, the day the boil opened up.

On March 9, Whiting was added to the sick call, and Buckland told him that he would be seen by the medical staff that day. Although the anticipated appointment was

---

[5] Although I already found that Whiting hasn't pointed to any facts supporting a claim of serious medical need during days 1–3 of his attempt to be seen in the medical office, for the sake of completeness, I will evaluate the nurses' conduct from their first encounters with him.

not given during daytime hours, Nurse Salinas tended to Whiting that evening, after seeing his open wound. As it relates to this case, Buckland met Whiting for the last time on March 10 but didn't have prescription medication for him. Instead, Whiting began his antibiotic regimen at 2 p.m. that day.

Nothing in these interactions between Buckland and Whiting suggests that Buckland acted recklessly when he considered the consequences of Whiting's case or that his actions were objectively unreasonable. During the first two days, Buckland directed Whiting to use the kiosk. When Whiting explained that the kiosk wasn't working for him, Buckland told him to "figure that out." When the problem persisted the following day, Buckland told Whiting he would talk to his superior. And on the day that the boil opened up, Buckland told whiting that he would be seen by medical personnel that day, and he was. The next day, Buckland didn't have the first dose of the antibiotic for Whiting during his morning rounds, but the medicine was given to Whiting in the early afternoon. There's no evidence that Buckland was purposefully withholding the antibiotic from Whiting. Thus, even when the facts are viewed in the light most favorable to Whiting, he cannot avoid a summary judgment as to his claims against Buckland.

Moreover, delaying treatment may constitute deliberate indifference if the delay "exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). However, as the Seventh Circuit has explained, "[i]n cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the

delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007) (internal citations omitted). Whiting has offered no such medical evidence.

Likewise, he cannot prevail against Nurse Salinas, who, from the first day that he complained of his sore, gave him antibiotic ointment and bandages (she gave him only a bandage on March 6) and then tended to him in the evening of the day when his wound opened up. Although Whiting might have preferred an antibiotic to the ointment that Nurse Salinas provided, a mistake in treatment is not constitutionally cognizable. *See Estelle v. Gamble*, 429 U.S. 97, 106-07 (1976). Thanks to Nurse Salinas, Whiting began his antibiotic treatment the very next day. Thus her actions were neither reckless nor objectively unreasonable. Whiting is essentially complaining about not having received the perfect care, but his claims do not amount to a constitutional violation. *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (finding a prisoner cannot demand specific care and is not entitled to the best possible care).

This brings me to the jail deputies. I start with the basic premise that, for a prison official to be personally liable, he must have participated in some way in the alleged constitutional violation. *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). Between noon and 4 p.m. on March 9, the day that Whiting was supposed to be seen by the medical staff and was eventually tended to by Nurse Salinas, he asked Deputy Cribbs over the intercom to be seen by the medical staff. Cribbs told him to make the request through the kiosk. Whiting called Deputy Cribbs again seven or ten times, making the same

request. (Whiting Dep. at 26, 31.) Eventually, Cribbs told him that if he kept pushing the button, he would be placed in segregation. Again, that very evening, Salinas tended to Whiting. As for Deputy Cummings, Whiting called him on the intercom on the first day he was to begin his oral antibiotic regimen and asked him to get someone from healthcare to bring the medication, but Cummings ignored him.

"When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention." *Miranda*, 900 F.3d at 343. Nothing in the evidence before me suggests that the two deputies knew that the jail's medical staff were failing to treat or were inadequately treating Whiting. In fact, given the outcome of Whiting's claims against the two nurses, which I find fail because the nurses were acting objectively reasonable, such finding is impossible.

**Conclusion**

For these reasons, the Court:

1. DENIES AS MOOT Whiting's Motion for Dispositive Deadline (ECF 63);

2. GRANTS Keith Buckland and Gina Salinas's motion for summary judgment (ECF 83);

3. GRANTS Ebony Cribbs and Christopher Cummings's motion for summary judgment (ECF 87); and

4. DIRECTS the Clerk to enter judgment in favor of Defendants Keith Buckland, Gina Salinas, Ebony Cribbs, and Christopher Cummings and against Plaintiff Stephen Wayne Whiting WITH PREJUDICE and to CLOSE this case.

SO ORDERED.

ENTERED: March 17, 2020.

/s/   Philip P. Simon  
PHILIP P. SIMON, JUDGE  
UNITED STATES DISTRICT COURT